Daniel L. Germain (Bar No. 143334)
Germain@Lalawyer.com
**ROSMAN & GERMAIN LLP**
16311 Ventura Blvd., Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

Counsel for Plaintiffs and the Putative Class

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

CHANTELL CAMPBELL, MARIE
NELLIST, BRIAN HORTON and
PAULINA CERVANTES, individually
and on behalf of all others similarly
situated,

              Plaintiffs,

      v.

PRIME HEALTHCARE SERVICES,
INC.; THE CHIEF EXECUTIVE
OFFICER OF PRIME HEALTHCARE
SERVICES, INC.; THE
ADMINISTRATIVE COMMITTEE OF
PRIME HEALTHCARE SERVICES,
INC.; and DOES 1-20.

              Defendants.

Case No.:

**CLASS ACTION COMPLAINT**

## COMPLAINT – CLASS ACTION

Plaintiffs Chantell Campbell, Marie Nellist, Brian Horton and Paulina Cervantes ("Plaintiffs"), by and through their attorneys, on behalf of the Prime Healthcare Services, Inc. 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Prime Healthcare Services, Inc. ("Prime" or "Company"), the Chief Executive Officer of Prime during the Class Period ("CEO"), and the Administrative Committee of Prime Healthcare Services, Inc. and its members during the Class Period[2] ("Committee") for breaches of their fiduciary duties.

2.    To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope.  29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*).

3.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.   In devising and implementing strategies for the investment and

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period is defined as September 11, 2014 through the date of Judgment.

management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

4. "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

5. As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

6. Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. Even though 401(k) accounts are fully funded at all times, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

7. The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See, "A Look at 401(k) Plan Fees," supra*, at

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

CLASS ACTION COMPLAINT

n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

8.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (July 2016), at 4. "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.*, at 5.

9.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

10.     At all times during the Class Period (September 11, 2014 through the date of judgment) the Plan had more than $405 million dollars in assets under management. At the end of 2017 and 2018, the Plan had over $861 million dollars and $878 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review

the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

12.     In many instances, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider certain collective trusts available during the Class Period as alternatives to the mutual funds in the Plan, despite their lower fees and materially similar investment objectives.  It appears that in 2019, nearly *five years* into the Class Period, the Plan switched to the collective trust versions of the Fidelity target date funds.  But this was too little too late as the damages suffered by Plan participants to that point had already been baked in. In accordance with sound fiduciary practices, the Plan should have switched to the Fidelity Freedom CIT target date funds at their earliest opportunity. The majority of the collective trust versions of the Fidelity Freedom target date funds were available as early as 2007.

13.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

16.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.   PARTIES

### Plaintiffs

18.    Plaintiff, Chantell Campbell ("Campbell"), resides in Midlothian, Virginia. During her employment, Plaintiff Campbell participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.    Plaintiff, Marie Nellist ("Nellist"), resides in Dover, Florida. During her employment, Plaintiff Nellist participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.    Plaintiff, Brian Horton ("Horton"), resides in Centerton, Arkansas. During his employment, Plaintiff Horton participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

21.    Plaintiff, Paulina Cervantes ("Cervantes"), resides in Dana Point, California.  During her employment, Plaintiff Cervantes participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

22.    Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their

accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

24.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

25.     Having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.   For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

### Company Defendant

26.     Prime Healthcare Services, Inc. ("Prime") is the Plan sponsor and a named fiduciary with a principal place of business being 3300 Guasti Road, 3rd Floor,

Ontario, CA 91761. 2018 Form 5500 filed with the United States Department of Labor ("2018 Form 5500") at 1.

27.   Prime is in the business of buying hospitals throughout the United States which are experiencing financial distress.   Since 2005, Prime "has invested approximately $1.7 billion on capital improvements and equipment." [4] As of 2020, Prime "owns 46 hospitals in 14 states" and has over 42,000 employees. *Id.*

28.   Prime makes discretionary decisions to make company discretionary contributions to Plan participants. The December 31, 2018 Report of the Independent Auditor of the Prime Healthcare Services, Inc. 401(k) Plan ("2018 Auditor Report") states that: "the Company may elect to make discretionary-matching and profit-sharing contributions to the Plan." Auditor Report at 5.

29.   Lastly, the Company, acting through its board of directors and officers, performs Plan-related fiduciary functions in the course and scope of their employment.

30.   For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**CEO Defendant**

31.   Prime's CEO is responsible for appointing the Committee and its members.

32.   Accordingly, the CEO during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

33.   Each CEO that served during the Class Period is collectively referred to herein as the "CEO Defendant."

---

[4] https://www.primehealthcare.com/About-Prime/Saving-Hospitals.aspx

**Committee Defendants**

34.    The Administrative Committee ("Committee"), is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102. The Administrative Committee maintains its address at Prime Healthcare's corporate headquarters in Ontario, California. The Committee is responsible for selecting and monitoring the performance of the funds in the Plan.

35.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

36.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as Does 1-10), are collectively referred to herein as the "Committee Defendants."

**Additional Doe Defendants**

37.    To the extent that there are additional officers, employees and/are contractors of Prime who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "Doe" Defendants 11-20 include, but are not limited to, Prime officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   THE PLAN

38.    The Prime Healthcare Services, Inc. 401(k) Plan ("Plan") was "formed on January 1, 2006." 2018 Auditor Report at 5. The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and

for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.   Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  2018 Auditor Report at 5-6.

### *Eligibility*

39.    In general, regular full-time employees who've reached the age of 21 are eligible to participate in the Plan. As stated in the 2018 Auditor Report: "[e]mployees of the Company are eligible to participate in the Plan upon reaching age 21 and after completing one month of service." 2018 Auditor Report at 5.

### *Contributions*

40.    There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions.  2018 Auditor Report at 5 and 6.

41.    With regard to employee contributions, "[p]articipants may elect to contribute between 1% and 100% of pretax annual compensation to the Plan each year" Auditor Report at 5.  With regard to matching contributions made by Prime, Prime "matches employee contributions, up to the lesser of $4,800 or 4% of the eligible compensation deferred to the Plan." *Id.*

42.    Like other companies that sponsor 401(k) plans for their employees, Prime enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

43.     Prime also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract    new    employees    and    reduce    turnover."   *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

44.     Given the size of the Plan, Prime likely enjoyed a significant tax and cost savings from offering a match.

### Vesting

45.     With regard to vesting in contributions made by participants: "[p]articipants are vested immediately in their contributions plus actual earnings thereon." 2018 Auditor Report at 6. With regard to matching contributions made by Prime: "[v]esting in Company contributions is based on years of service with increases in increments of 20% per year until fully vested after five years." *Id.*

### The Plan's Investments

46.     In theory, the Committee selects and monitors the performance of the funds in the Plan. But in practice, as alleged below, the Committee breached these fiduciary duties.

47.     Several funds were available to Plan participants for investment each year during the putative Class Period, including a suite of target date funds managed by Fidelity.

48.     The Plan's assets under management for all funds as of December 31, 2018 was over $878 million dollars.  2018 Auditor Report at 4.

### Payment of Plan Expenses

49.     During the Class Period Plan assets were used to pay for expenses incurred by the Plan, including recordkeeping fees. 2018 Auditor Report at 6. As detailed in the Auditor Report: "Participant accounts are charged with an allocation of administrative expenses that are paid by the Plan. Allocations are based on participant earnings, account balances, or specific participant transactions, as defined." *Id.*

# V. CLASS ACTION ALLEGATIONS

50.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 11, 2014 through the date of judgment (the "Class Period").

51.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 43,050 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at 2.

52.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

53.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.     Whether Defendants are fiduciaries of the Plan;

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

B.    Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.    Whether the Company and CEO Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

54.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class.   Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

55.    This action may be properly certified under Rule 23(b)(1).   Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.   Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

56.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS
## <u>AND OVERVIEW OF FIDUCIARY DUTIES</u>

57.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

58.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

59.     As described in the Parties section above, Defendants were fiduciaries of the Plan because:

      (a)     they were so named; and/or

      (b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

      (c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

      (d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

60.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence and are "the highest known to the law." *Tibble*, 843 at 1197.

61.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.  *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . .  A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

62.    In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons.

63.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

64.    In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

65.     During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

66.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate for (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

67.     As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.   SPECIFIC ALLEGATIONS

**Defendants Breached Their Fiduciary Duties in Failing
to Investigate and Select <u>Lower Cost Alternative Funds</u>**

68.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several investments in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participants' assets because of unnecessary costs.

69.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts, ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts, § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

70.     Investment options have a fee for investment management and other services.  With regards to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return. This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

71.     When large plans, particularly those with between $500 million dollars and $1 billion dollars in assets like the Plan here, have options which approach the

1  retail cost of shares for individual investors or are simply more expensive than the

2  average or median institutional shares for that type of investment, a careful review of

3  the plan and each option is needed for the fiduciaries to fulfill their obligations to the

4  plan participants.

5       72.   One indication of Defendants' failure to prudently monitor the Plan's

6  funds is that the Plan has retained several actively-managed funds as Plan investment

7  options despite the fact that these funds charged grossly excessive fees compared

8  with comparable or superior alternatives, and despite ample evidence available to a

9  reasonable fiduciary that these funds had become imprudent due to their higher costs

10 relative to the same or similar investments available.  This fiduciary failure decreased

11 participant compounding returns and reduced the available amount participants will

12 have at retirement.

13      73.   Another indication of Defendants' failure to prudently monitor the

14 Plan's funds is that several funds during the Class Period – which stayed relatively

15 unchanged during the Class Period - were more expensive than comparable funds

16 found in similarly sized plans (plans having between $500 million dollars and $1

17 billion dollars in assets).

18      74.   In 2018, for example, many of the mutual funds in the Plan, which in

19 most cases had remained in the fund unchanged since 2014, had in some cases a

20 *107%* difference (in the case of State Street Cash Reserves Fund Premier Class) and a

21 *73%* difference (in the case of Delaware Small Cap Value Inst.) from the median

22 expense ratios in the same category. The chart below illustrates these differences for

23 each applicable fund in the Plan:[6]

24

25

26

---

27 [6] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62
   (June 2019) (hereafter, "ICI Study") available at
28 https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

| Plan in Fund | Exp. Ratio[7] | Investment Style | ICI Median |
|---|---|---|---|
| Fidelity Freedom 2035 | 0.72 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2050 | 0.75 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2040 | 0.75 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2045 | 0.75 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2055 | 0.75 % | Target-date Fund | 0.65% |
| Fidelity Freedom 2060 | 0.75 % | Target-date Fund | 0.65% |
| PGIM Jennison Growth Z | 0.71 % | Domestic Equity | 0.42% |
| Putnam Equity Income Y | 0.66 % | Domestic Equity | 0.42% |
| Oakmark Equity and Income Investor | 0.81 % | Non-target date Balanced | 0.40% |
| MFS International Intrinsic Value R4 | 0.73 % | Int'l Equity | 0.54% |
| American Funds Europacific Growth R4 | 0.81 % | Int'l Equity | 0.54% |
| T. Rowe Price Mid-Cap Value I | 0.65 % | Domestic Equity | 0.42% |
| MassMutual Select Mid Cap Growth I | 0.71 % | Domestic Equity | 0.42% |
| Delaware Small Cap Value Instl | 0.90 % | Domestic Equity | 0.42% |
| PGIM Jennison Small Company Z | 0.82 % | Domestic Equity | 0.42% |
| Invesco Real Estate R5 | 0.87 % | Domestic Equity | 0.42% |
| State Street Cash Reserves Fund Premier Class | 0.46 % | Money Market | 0.14% |

75.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the above ICI Median fee is based on a study conducted in 2016 when expense ratios were generally higher than fees today or even in 2019 given the downward trend of expense ratios the last few years. Indeed, the ICI median expense ratio for domestic equity funds for plans with between $500 million dollars and $1 billion dollars in assets was 0.52% using 2015 data compared with 0.42% in 2016.  Accordingly, 2019 median expense ratios would be lower than indicated above, demonstrating a greater disparity between the 2019

---

[7]  The listed expense figures are as of 2020.

expense ratios utilized in the above chart for the Plan's funds and the median expense ratios in the same category.

76.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

### Failure to Investigate Availability of Lower Cost Collective Trusts

77.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

78.     Collective trusts, also referred to as CITs, are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

79.     As noted *supra*, ERISA is derived from trust law.  *Tibble I*, 135 S. Ct. at 1828.  Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law.  *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).  One such area is the selection of appropriate funds for a plan.  Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts, § 100 cmt. b(1).  To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  *Id.* (emphasis added).

80.    Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.  Defendants knew this, or at least should have known this, because the Plan maintained at least one collective trust during the Class Period. In 2015, the Plan had at least 1 collective trust. By 2018, the Plan increased the number of collective trusts to 4.

81.    Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise or issue formal prospectuses.  As a result, their costs are much lower, with lower or no administrative costs, and lower or no marketing or advertising costs.  *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available                                                                                   at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

82.    Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; Use *of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[8]

---

[8] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online.  *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter "*CITs Gaining Ground*").  Many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual funds. *Use of CITs in DC Plans Booming; CITs Gaining Ground*.  And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the plan has the same level of protection that the

83.     A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available collective trusts. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity.  Here, during the Class Period, Fidelity offered collective trust versions of the target date funds in the Plan with the exception of the FIAM Blend Target Date 2060 Q Fund which was not available until May 15, 2015:

| Fund in Plan | Exp. Ratio[9] | Collective Trust Version[10] | Incep Date | Exp. Ratio[11] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom 2035 Fund | 0.75% | FIAM Blend Target Date 2035 Q Fund | Oct. 31 2007 | 0.32% | 134% |
| Fidelity Freedom 2040 Fund | 0.75% | FIAM Blend Target Date 2040 Q Fund | Oct. 31 2007 | 0.32% | 134% |
| Fidelity Freedom 2045 Fund | 0.75% | FIAM Blend Target Date 2045 Q Fund | Oct. 31 2007 | 0.32% | 134% |
| Fidelity Freedom 2050 Fund | 0.75% | FIAM Blend Target Date 2050 Q Fund | Oct. 31 2007 | 0.32% | 134% |

Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act.  Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

[9] The listed expense figures are as of 2020.

[10] As detailed in Section I above, it appears that in 2019, nearly *five years* into the Class Period, the Plan switched to the collective trust versions of the Fidelity target date funds.  But this was too late as the damages suffered by Plan participants to that point had already been baked in. In accordance with sound fiduciary practices, the Plan should have switched to the Fidelity CIT target date funds at their earliest opportunity. As indicated in the chart above, the collective trust versions of the Fidelity target date funds were available as early as 2007.

[11] The listed expense figures are as of 2020.

CLASS ACTION COMPLAINT

| Fund in Plan | Exp. Ratio[9] | Collective Trust Version[10] | Incep Date | Exp. Ratio[11] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom 2055 Fund | 0.75% | FIAM Blend Target Date 2055 Q Fund | July 12 2011 | 0.32% | 134% |
| Fidelity Freedom 2060 Fund | 0.75% | FIAM Blend Target Date 2060 Q Fund | May 15 2020 | 0.32% | 134% |
| Fidelity Freedom 2005 Fund | 0.47% | FIAM Blend Target Date 2005 Q Fund | Oct. 31 2007 | 0.32% | 47% |
| Fidelity Freedom 2010 Fund | 0.51% | FIAM Blend Target Date 2010 Q Fund | Oct. 31 2007 | 0.32% | 59% |
| Fidelity Freedom 2015 Fund | 0.55% | FIAM Blend Target Date 2015 Q Fund | Oct. 31 2007 | 0.32% | 72% |
| Fidelity Freedom 2020 Fund | 0.69% | FIAM Blend Target Date 2020 Q Fund | Oct. 31 2007 | 0.32% | 116% |
| Fidelity Freedom 2025 Fund | 0.65% | FIAM Blend Target Date 2025 Q Fund | Oct. 31 2007 | 0.32% | 103% |
| Fidelity Freedom 2030 Fund | 0.68% | FIAM Blend Target Date 2030 Q Fund | Oct. 31 2007 | 0.32% | 112% |

84.   The above is for illustrative purposes only.  During the Class Period, Defendants knew or should have known of the existence of these available collective trusts and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

85.    As noted above, minimum initial investment amounts are typically waived for institutional investors like retirement plans.  *See, e.g., Davis, et al. v. Washington Univ., et al.*, 960 F.3d 478, at 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda,* 923 F.3d at 329 (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).  Here, "[t]he eligibility requirement for FIAM Blend Target Date is $25 million in client assets."  *See* Fidelity Pricing Options for Retirement Plans as of Dec. 31, 2019 ("Fidelity Pricing"), p. 11.  And, "[c]lient assets is defined as assets invested in qualified defined contribution plans only, which are profit sharing, 401(k), and defined benefit plans that are qualified under Section 401(a) and governmental plans that are described in section 401(a)24 of the IRS code."  *Id.*

86.    Target date funds are sold as a package with the minimum investment amount referring to the total amount invested across all target date funds. In 2018, for example, the Plan had twelve Fidelity Freedom target date funds ranging from an expected retirement date of 2005 to 2060 at five-year intervals. A minimum needed to qualify refers to the total of all assets held in all of the 12 funds collectively. Looking at 2018, the Plan had over $384 million dollars invested in Fidelity target date funds. As discussed above, the CIT version of these funds, FIAM Blend Target Date Q Funds, only required a $25 million investment amount.

87.    Clearly, per the below chart, the Plan had sufficient assets under management during the Class Period to qualify for the CIT version of the Fidelity target date funds:[12]

---

[12] As further evidence that the Plan could have moved to collective trusts throughout the Class Period, the Plan did in fact move to collective trusts in 2019. Clearly this move should have been made as soon as these collective trusts became available in 2007.

| Fund in the Plan | 2018 AUM | 2017 AUM | 2016 AUM | 2015 AUM | 2014 AUM |
|---|---|---|---|---|---|
| Fidelity Freedom 2005 through 2060 Funds[13] | $384,144,310 | $364,333,042 | $235,291,229 | $140,689,415 | $78,778,804 |

88.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper available collective trusts and transferred the Plan's investments into the lower cost funds at the earliest opportunity.

89.     There is no good-faith explanation for utilizing higher-cost funds when lower-cost funds are available for the exact same investment.  Indeed, given that the collective trusts were comprised of the same underlying investments as their mutual fund counterparts, and managed by the same investment manager, but had lower fees, they generally had greater returns when looking at the 1, 3, 5, and 10 year average annual returns.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive funds; the only consequence was higher costs for Plan participants.  Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

90.     Moreover, it is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs.

---

[13] Target date funds are negotiated and sold as a package. The minimum buy in amount for target date funds is based on the amount under management for all target date funds in any given Plan. Here FIAM Blend Target Date Q Funds, only required a $25 million investment amount. Clearly, the Plan would have qualified for these CITs throughout the Class Period. In 2014 through 2017, the Plan did not have 2055 and 2060 target date funds.

*Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 8 (C.D. Cal. Aug. 16, 2017) ("*Tibble III*"). Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Id.*, at * 11. This lack of basic fiduciary practice resonates loudly in this case given the unreasonable recordkeeping and administrative costs arrangements put in place by Defendants.

91. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

92. Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

93. Prime's retirement plan is large and has scale which affords the Plan fiduciaries the opportunity to negotiate for lower recordkeeping costs and get access to the same investments with lower expense ratios which benefit the plan participants because the returns are higher and compounding greater.

94. As of August 1, 2019, the Plan pays an annual fee to its recordkeeper, Transamerica Retirement Solutions, LLC ("Transamerica"), in the amount of $50 per

participant account. This compensation is derived primarily from revenue remitted to Transamerica via various Plan investment options. Prior to the August 1 change, the Plan paid Transamerica an administrative fee for its recordkeeping services in the amount of 0.26% of the Plan's assets annually. The total fee was deducted from participant accounts pro rata based upon their balance. As the Plan's total asset level grew in size, due to contributions and the rise of the market, Transamerica received steadily more compensation even though the level of services it provided to the Plan remained constant. Though Defendants belatedly acted to cap that fee at $50 per participant, this amount is still unjustifiable for a plan with over 43,000 participants. According to the average cost for recordkeeping **and** administration in 2017 for plans much smaller than the Plan (plans with 100 participants and $5 million in assets) was $35 per participant. As of December 31, 2018, the Plan had approximately $880 million in assets and 43,050 participants. Given its size, and resulting negotiating power, with prudent management and administration, the Plan would have unquestionably been able to obtain a per-participant cost significantly lower than $35 per participant. [14]

95.    This arrangement was completely unnecessary given that the Plan's fiduciaries could bargain for a per participant/capita fee as numerous large plans have done with Fidelity.  In a recent action where Fidelity was a defendant and involving Fidelity's own plan, the parties stipulated with regard to Fidelity's recordkeeping services that "if Fidelity were a third party negotiating this fee structure at arms-

---

[14] Case law is in accord that large plans can bargain for low recordkeeping fees. *See, e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping); *see also 401k Averages Book* at 95  (20th ed. 2020) (showing that a plan with only 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant).

CLASS ACTION COMPLAINT

length, the value of services would range from $14-$21 per person per year over the class period." *Moitoso v. FMR LLC*, 2020 WL 1495938, at * 15 (D. Mass. Mar. 27, 2020).   Accordingly, Fidelity has acknowledged the ability of plan fiduciaries to negotiate per participant/capita fees.

96.    A more prudent arrangement in this case, also more transparent and easier to comprehend by participants, would have been to take advantage of the Plan's scale by selecting available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration fees.

97.    By failing to investigate the availability of certain collective trusts, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees. Defendants further cost Plan participants millions of dollars during the Class Period by (1) failing to negotiate a lower recordkeeping rate with Fidelity and (2) to the extent Defendants held revenue sharing amounts for a prolonged period of time and failed to remit any excess revenue sharing back to Plan participants.

### Failure to Utilize Lower Fee Share Classes

98.    Plan fiduciaries had an option to choose lower cost Fidelity collective trusts during the Class Period.   But they also had the option of other lower cost identical funds which they similarly failed to select.   Since June 2017, Fidelity has offered K shares of its target date funds.   Generally, "K6 Funds and Class K are available to retirement plans recordkept at Fidelity [like the Plan here]." Fidelity Pricing at 3.   "K6 Funds are intended for plan sponsors that do not want to receive any revenue sharing or recordkeeping offsets." *Id.*   The K6 target date shares were significantly cheaper than the retail Freedom target date shares – price being the only difference between the two classes of shares.   The following chart illustrates the point:

| Fund in Plan | Exp. Ratio[15] | K6 | Incep Date[16] | Exp. Ratio[17] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom 2005 Fund | 0.47% | Fidelity Freedom K6 2005 Fund | June 7 2017 | 0.37% | 27% |
| Fidelity Freedom 2010 Fund | 0.51% | Fidelity Freedom K6 2010 Fund | June 7 2017 | 0.39% | 31% |
| Fidelity Freedom 2015 Fund | 0.55% | Fidelity Freedom K6 2015 Fund | June 7 2017 | 0.41% | 34% |
| Fidelity Freedom 2020 Fund | 0.69% | Fidelity Freedom K6 2020 Fund | June 7 2017 | 0.43% | 60% |
| Fidelity Freedom 2025 Fund | 0.65% | Fidelity Freedom K6 2025 Fund | June 7 2017 | 0.45% | 44% |
| Fidelity Freedom 2030 Fund | 0.68% | Fidelity Freedom K6 2030 Fund | June 7 2017 | 0.47% | 45% |
| Fidelity Freedom 2035 Fund | 0.75% | Fidelity Freedom K6 2035 Fund | June 7 2017 | 0.49% | 53% |
| Fidelity Freedom 2040 Fund | 0.75% | Fidelity Freedom K6 2040 Fund | June 7 2017 | 0.50% | 50% |

[15] The listed expense figures are as of 2019.

[16] *See* May 30, 2020 Fidelity Freedom Funds Prospectus.

[17] The listed expense figures are as of 2019.

| Fund in Plan | Exp. Ratio[15] | K6 | Incep Date[16] | Exp. Ratio[17] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom 2045 Fund | 0.75% | Fidelity Freedom K6 2045 Fund | June 7 2017 | 0.50% | 50% |
| Fidelity Freedom 2050 Fund | 0.75% | Fidelity Freedom K6 2050 Fund | June 7 2017 | 0.50% | 50% |
| Fidelity Freedom 2055 Fund | 0.75% | Fidelity Freedom K6 2055 Fund | June 7 2017 | 0.50% | 50% |
| Fidelity Freedom 2060 Fund | 0.75% | Fidelity Freedom K6 2060 Fund | June 7 2017 | 0.50% | 50% |

99.     Additionally, the Plan fiduciaries added five funds during the Class Period that cost more than available identical lower share classes:

| Fund in the Plan | ER | Lower Cost Share | ER[18] | % Fee Excess |
|---|---|---|---|---|
| PEIYX $ 46,182,150 Putnam Equity Income Y | .66% | PEQSX Putnam Equity Income R6 | .55% | 20% |
| MINHX $ 24,092,445 MFS International Intrinsic Value R4 | .73% | MINJX MFS International Intrinsic Value R6 | .63% | 16% |
| REREX $ 22,605,655 American Funds Europacific Growth R4 | .81% | RERGX American Funds Europacific Growth R6 | .46% | 76% |
| PSCZX $ 9,320,916 PGIM Jennison Small Company Z | .82% | PJSQX PGIM Jennison Small Company R6 | .69% | 19% |

[18] The listed expense figures are as of 2020.

| Fund in the Plan | ER | Lower Cost Share | ER[18] | % Fee Excess |
|---|---|---|---|---|
| IARIX $ 4,995,782 Invesco Real Estate R5 | .87 % | IARFX Invesco Real Estate R6 | .79 % | 10% |

100.   Recently, a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved … in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble III*, 2017 WL 3523737, at * 13.

101.   Defendants knew or should have known of the existence of the above cheaper share classes (for the Fidelity, Putnam, MFS, American, Invesco and PGIM funds) and therefore also should have immediately identified the prudence of selecting the alternative investments which were all available during the Class Period.

102.   As noted above, qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds. However, initial investment minimums are generally waived for financial intermediaries and retirement plans.

103.   A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and selected a lower share class than the ones in the Plan.

104.   Failure to do so was either because Defendants did not negotiate aggressively enough with their service providers to obtain better pricing or they simply were not paying attention.

105.   Nor is it an excuse to select higher cost versions of the same fund to pay for Plan expenses. As noted above, fiduciaries should not "choose otherwise

imprudent investments specifically to take advantage of revenue sharing." *Tibble III*, 2017 WL 3523737, at * 11.

106.   By failing to investigate the use of lower cost share classes, Defendants caused the Plan and its participants to pay millions of dollars per year in unnecessary fees.

### *Failure to Utilize Lower Cost Passively-Managed Funds*

107.   As noted *supra*, ERISA is derived from trust law. *Tibble I*, 135 S. Ct. at 1828.  Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts, § 100 cmt. b(1).

108.   While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market? Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively-managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively-managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

109.   Indeed, on average, funds with high fees perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa.

L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

110.    During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options.  This failure is a further indication that Defendants lacked a prudent investment monitoring process.

111.    The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively and actively managed alternative funds in the same fund category.  The chart below analyzes funds in the Plan in 2018 using 2018 expense ratios as a methodology to demonstrate the greater relative expense of the Plan's funds compared to their alternative fund counterparts.

| Current Fund | Exp. Ratio | Passive/Active Lower Cost Alternative | Exp. Ratio | Incep. Date | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom 2025 | 0.65% | Fidelity Freedom Index 2025 Investor | 0.12% | 10/2/2009 | 442% |
| | | American Funds 2025 Trgt Date Retire R6 | 0.33% | 7/13/2009 | 97% |
| Fidelity Freedom 2020 | 0.60% | Fidelity Freedom Index 2020 Investor | 0.12% | 10/2/2009 | 400% |
| | | American Funds 2020 Trgt Date Retire R6 | 0.31% | 7/13/2009 | 94% |
| Fidelity Freedom 2030 | 0.68% | Fidelity Freedom Index 2030 Investor | 0.12% | 10/2/2009 | 467% |
| | | American Funds 2030 Trgt Date Retire R6 | 0.35% | 7/13/2009 | 94% |
| Fidelity Freedom 2035 | 0.72% | Fidelity Freedom Index 2035 Investor | 0.12% | 10/2/2009 | 500% |
| | | American Funds 2035 Trgt Date Retire R6 | 0.37% | 7/13/2009 | 95% |
| Fidelity Freedom 2050 | 0.75% | Fidelity Freedom Index 2050 Investor | 0.12% | 10/2/2009 | 525% |
| | | American Funds 2050 Trgt Date Retire R6 | 0.39% | 7/13/2009 | 92% |

| Current Fund | Exp. Ratio | Passive/Active Lower Cost Alternative | Exp. Ratio | Incep. Date | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom 2040 | 0.75% | Fidelity Freedom Index 2040 Investor | 0.12% | 10/2/2009 | 525% |
| | | American Funds 2040 Trgt Date Retire R6 | 0.38% | 7/13/2009 | 97% |
| Fidelity Freedom 2045 | 0.75% | Fidelity Freedom Index 2045 Investor | 0.12% | 10/2/2009 | 525% |
| | | American Funds 2045 Trgt Date Retire R6 | 0.38% | 7/13/2009 | 97% |
| Fidelity Freedom 2015 | 0.55% | Fidelity Freedom Index 2015 Investor | 0.12% | 10/2/2009 | 358% |
| | | American Funds 2015 Trgt Date Retire R6 | 0.31% | 7/13/2009 | 77% |
| Fidelity Freedom 2055 | 0.75% | Fidelity Freedom Index 2055 Investor | 0.12% | 10/2/2009 | 525% |
| | | American Funds 2055 Trgt Date Retire R6 | 0.40% | 7/13/2009 | 88% |
| Fidelity Freedom 2010 | 0.51% | Fidelity Freedom Index 2010 Investor | 0.12% | 10/2/2009 | 325% |
| | | American Funds 2015 Trgt Date Retire R6 | 0.31% | 7/13/2009 | 64% |
| Fidelity Freedom 2060 | 0.75% | Fidelity Freedom Index 2060 Investor | 0.12% | 10/2/2009 | 525% |
| | | American Funds 2060 Trgt Date Retire R6 | 0.41% | 7/13/2009 | 83% |
| Metropolitan West Total Return Bd Plan | 0.37% | Vanguard Interm-Term Bond Index Adm | 0.07% | 11/12/2001 | 429% |
| | | Johnson Institutional Core Bond | 0.25% | 8/31/2000 | 48% |
| PGIM Jennison Growth Z | 0.71% | JPMorgan Large Cap Growth R6 | 0.44% | 10/30/2010 | 61% |
| Putnam Equity Income Y | 0.66% | American Funds American Mutual R6 | 0.28% | 5/1/2009 | 136% |
| Oakmark Equity And Income Investor | 0.81% | Vanguard Balanced Index Adm | 0.07% | 11/13/2000 | 1057% |
| | | Vanguard LifeStrategy Moderate Gr Inv | 0.13% | 9/30/1994 | 523% |

| Current Fund | Exp. Ratio | Passive/Active Lower Cost Alternative | Exp. Ratio | Incep. Date | % Fee Excess |
|---|---|---|---|---|---|
| MFS International Intrinsic Value R4 | 0.73% | Vanguard International Growth Adm | 0.32% | 8/13/2001 | 128% |
| American Funds Europacific Growth R4 | 0.81% | Vanguard International Growth Adm | 0.32% | 8/13/2001 | 153% |
| | | American Funds Europacific Growth R6 | 0.46% | 5/1/2009 | 76% |
| T. Rowe Price Mid-Cap Value I | 0.65% | Victory Sycamore Established Value R6 | 0.58% | 3/4/2014 | 12% |
| MassMutual Select Mid Cap Growth I | 0.71% | Franklin Small-Mid Cap Growth R6 | 0.50% | 2/14/1992 | 42% |
| Delaware Small Cap Value Instl | 0.90% | Vanguard Small Cap Value Index Admiral | 0.07% | 9/27/2011 | 1186% |
| | | Vanguard Explorer Value Inv | 0.55% | 3/30/2010 | 64% |
| PGIM Jennison Small Company Z | 0.82% | Vanguard Small Cap Growth Index Admiral | 0.07% | 9/27/2011 | 1071% |
| | | Vanguard Explorer Adm | 0.34% | 11/12/2001 | 141% |
| Invesco Real Estate R5 | 0.87% | TIAA-CREF Real Estate Sec Instl | 0.51% | 12/04/2015 | 71% |
| | | Invesco Real Estate R6 | 0.79% | 5/1/1995 | 10% |
| State Street Cash Reserves Fund Premier Class | 0.46% | Vanguard Treasury Money Market Investor | 0.09% | 12/14/1992 | 411% |

112.   The above alternative funds generally outperformed the Plan's funds in their 3 and 5 year average returns as of 2020 given that they were comprised of virtually identical underlying funds but had lower fees.  Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.

113.  These results are not surprising with regard to the passively managed alternatives detailed above given that in the long-term, actively managed funds do not outperform their passively managed counterparts.  Indeed, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:[19]

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark  5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 |

114.  A prudent investigation would have revealed the existence of these lower-cost and better performing alternatives to the Plan's funds.

115.  The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period. The Plan expense

---

[19] Source: https://us.spindices.com/spiva/#/reports

ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

### FIRST CLAIM FOR RELIEF
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee Defendants)**

116. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

117. At all relevant times, the Committee Defendants ("Loyalty/Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

118. As fiduciaries of the Plan, the Loyalty/Prudence Defendants were subject to the fiduciary duties imposed by ERISA Section 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

119. The Loyalty/Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Instead, the Loyalty/Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Loyalty/Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. In addition, the Loyalty/Prudence Defendants failed to investigate certain collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services

at a lower cost.   Likewise, the Loyalty/Prudence Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

120.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.   Had the Loyalty/Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

121.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Loyalty/Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.   In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for the Loyalty/Prudence Defendants' breaches as set forth in their Prayer for Relief.

122.   The Loyalty/Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Loyalty/Prudence Defendant is also liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Prime and the CEO Defendants)**

123.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

124.   Prime and the CEO Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

125.   In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were

adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

126.   The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

127.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, imprudent choices of funds' class of shares, and inefficient fund management styles that adversely affected the investment performance of the Funds' and their participants' assets as a result of the Committee Defendants' imprudent actions and omissions;

(b)   Failing to monitor the processes by which Plan investments were evaluated, failing to correct the Committee Defendants' failure and continued failure to investigate the availability of lower-cost share classes and failing to correct the Committee Defendants' failure and continued failure to investigate the availability of lower-cost collective trust vehicles; and

(c)   Failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

128.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

129.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.   An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive

trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: September 11, 2020           **ROSMAN & GERMAIN LLP**

*/s/ Daniel L. Germain*
Daniel L. Germain (CA Bar No. 143334)
germain@lalawyer.com
16311 Ventura Boulevard, Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

**CAPOZZI ADLER, P.C.**

*/s/ Donald R. Reavey*
Donald R. Reavey
donr@capozziadler.com
(*Admission Pro Hac Vice to be Requested*)
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103

**CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*

Mark K. Gyandoh
markg@capozziadler.com
(*Admission Pro Hac Vice to be Requested*)
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103

Counsel for Plaintiffs and the Putative Class

CLASS ACTION COMPLAINT